**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

HENRY F. OSGOOD,

                                        Plaintiff,

        v.                                                        No. 12-CV-565
                                                                        (TJM/CFH)

MICHAEL J. AMATO, Sheriff; MICHAEL
FRANKO, Jail Administrator;

                                        Defendants.
_____

**APPEARANCES:**                                **OF COUNSEL:**

HENRY F. OSGOOD
Plaintiff Pro Se
Collins Correctional Facility
Post Office Box 340
Collins, New York 14034

LAW OFFICE OF THERESA PULEO                MURRY S. BROWER, ESQ.
Attorney for defendants
Post Office Box 12699
Albany, New York 12212

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff pro se Henry Osgood ("Osgood"), who at the relevant time in question appears

to have been pretrial detainee in custody at a local jail, brings this action pursuant to 42

U.S.C. § 1983 alleging that defendants, the Montgomery County Sheriff and Jail

Administrator, violated his constitutional rights under the Eighth Amendment.  Compl. (Dkt.

No. 1).  Presently pending is defendants' motion for summary judgment pursuant to Fed. R.

Civ. P. 56.  Dkt. No. 18.  Osgood has not responded to the present motion.  For the

_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

following reasons, it is recommended that defendants' motion be granted in part and denied in part.[2]

## I. Failure to Respond

Osgood did not oppose defendants' motion. "[J]udgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Defendants' provided such notice in the notice of motion, stating that Osgood "must respond by affidavits or as otherwise provided in the rule, setting forth specific facts showing that there is a genuine issue of material fact for trial." Dkt. No. 18 at 1. Moreover, the Court provided notification to Osgood regarding both the date of his response and the consequences of failing to respond. Dkt. No. 19. Despite such notice, Osgood failed to respond. Because Osgood has not responded to raise any question of material fact, to the extent defendants have pled properly supported facts, such facts as set forth by defendants are accepted as true. See Cusamano v. Sobek, 604 F. Supp. 2d 416, 452-453, 453 n.48 (N.D.N.Y. 2009); see also N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.") (emphasis in original).

---

[2] Defendants move for summary judgment contending that (1) Osgood's conditions of confinement and Equal Protection claims were meritless, (2) Osgood has failed to allege a physical injury sufficient to grant him the damages he seeks, and (3) they are protected by qualified immunity. Defs Mem. of Law (Dkt. No. 18 at 3-16) at 5-12. Defendants state, in a conclusory manner, that Osgood's access to counsel and law library claims are also meritless. Id. at 4-5. Defendants fail to discuss the merit of Osgood's inartfully pled due process claims which, for the reasons stated infra, should not be dismissed.

2

## II. Background

Revised in January 2010, Montgomery County Correctional Facility ("Montgomery") had a specific policy regarding administrative segregation for protective custody. Dkt. No. 18 at 45, 48. After an inmate had undergone screening and classification, he could be assigned to protective custody, being locked in his cell for twenty-three hours a day for a sixty day period of time. Id. at 48. However, the inmate could seek review of said classification, through a written request to the jail administrator, after sixty days provided "there [wa]s no further threat to [the inmate's] safety . . . ." Id. If such a threat remained, the inmate's situation may be re-evaluated every thirty days until such time as the threat dissipated. Id.

Osgood arrived at Montgomery on January 31, 2012 as a pretrial detainee upon charges for failure to register based on an assault charge. Franko Aff. (Dkt. No. 18 at 63-69) ¶ 2; Dkt. No. 18 at 84 (New Admissions form indicating that Osgood arrived at the facility on January 31, 2012); Dkt. No. 18 at 86 (Custodial Transfer sheet indicating that Osgood had been in custody since January 31, 2012); but cf. Compl. at 4 (indicating that Osgood was detained on January 30, 2012).[3] Upon arrival, all inmates are processed and evaluated for placement in the appropriate housing unit consistent with the policy outlined above. Franko Aff. ¶ 3; Id. ¶ 6 (explaining that classification officers consider an inmate's "past criminal history . . . and information if that person has been in the jail on other occasions," as well as interviewing the inmate). Osgood's classification was determined after evaluating "the

---

[3] It appears that on June 13, 2012, Osgood pled and was sentenced "as a second felony offender to an indeterminate 2 ½ to 5 years . . . ." Dkt. No. 18 at 100. On July 3, 2012, Osgood was transferred from Montgomery to a state correctional facility. Franko Aff. ¶ 2. Accordingly, while Osgood was ultimately convicted, during the time in question he was a pretrial detainee.

3

charges pending and his past history of [sex based] criminal offenses . . . [for which defendants concluded that Osgood] was therefore considered to be vulnerable to injury from inmates housed in the regular population." Franko Aff. ¶ 5; see also Dkt. No. 18 at 71-75 (inmate classification form awarding (1) ten points for requesting or requiring administrative segregation for safety; (2) twenty-nine points for a pending violent felony or sex offense; (3) twenty points for a prior violent felony or sex offense; (4) twenty five points for health concerns; and (5) fifteen points for a history of assault; and determining that Osgood required protective custody and close supervision despite a lack of any victimization history "due to previous convictions, safety, [and] security of facility [and] oneself.").

After spending approximately four days undergoing classification, on or about February 4, 2012, Osgood received notification that Classification Officer Smith had administratively segregated Osgood into involuntary protective custody (hereinafter "IPC") "[d]ue to [his] previous convictions, safety, [and] security of oneself [and the] facility." Dkt. No. 18 at 75; see also Franko Aff. ¶ 3 (explaining that Osgood was first assigned IPC on February 4, 2012); Dkt. No. 18 at 75 (IPC notification form signed by both Officer Smith and Osgood on February 4, 2012); cf. Compl. at 4 (alleging that he spent five days in classification and was placed in IPC on February 6, 2012). Osgood signed the Administrative Segregation Notice Form indicating that he was being placed in IPC for his own protection. Dkt. No. 18 at 75.

On February 18, 2012, Osgood authored a letter which raised concern regarding the stability of his mental health. Dkt. No. 18 at 83. Pursuant to mental health staff's orders, Osgood was placed on constant watch later that same day. Dkt. No. 18 at 79-82. His placement was continued in IPC. Franko Aff. ¶ 4.

4

"In the late fall of 2010 and continuing into the winter and spring of 2011[] the inmate population of Montgomery . . . was growing[; thus] the Sheriff and [Administrator] began to discuss how the rising population might impact the safety of inmates and . . . of corrections officers assigned to the various pods . . . . " Franko Aff. ¶ 8.  Specifically during this time period, there was "a rise in the population of sex offenders[, which] . . . was a concern given that sex offenders are often victimized in a correction setting when housed in the general population."  Franko Aff. ¶ 9.  This also caused a concern for the safety of the correctional staff "who intervene to break up fights and provide a higher level of protection to the vulnerable population." Id.

While in IPC, it is undisputed that Osgood was locked in his cell for twenty-three hours a day, with one hour of recreation during which he could use the phone or shower.  Compl. at 4-5; see also Franko Aff. ¶ 10 (confirming that the sex offenders were locked down for twenty three hours a day because "[w]hile [defendants] would have liked to have given each of the persons housed at the jail the ability to move about the pod, this was not possible because of the number of persons the facility was housing and . . . the then current staffing levels."); Id. ¶ 11 (explaining that IPC inmates "were not given the option to join the general population [yet w]hile in [IPC, inmates] . . . were allowed out of their cells for one hour each day for recreation, showers, etc.").  During the time period in question, while he was in IPC, Osgood never violated any disciplinary rules and was upset that his confinement was restricted similarly to those who had committed severe disciplinary infractions who then were subjected to restricted access about the housing unit, restricted ability to shower and access various amenities, limited access to the law library, and limited opportunities to communicate freely with their attorney, family and other inmates, and watch television.

5

Compl. at 4-6.

Defendants emphatically state that placement in IPC was not punitive, but prophylactic. Franko Aff. ¶ 14 (explaining IPC placements were "intended primarily to address the conditions at the jail of a higher than normal population of sex offenders who belong to a class of inmates who are most often targeted for victimization."). Further, defendants assert that IPC inmates "were allowed visitation from those outside the jail during a time set aside for [IPC] . . . inmates." Franko Aff. ¶ 12; <u>see also</u> Dkt. No. 18 at 55 (facility rule book with visitation schedule indicating IPC inmates had visitation between 10:00 and 11:00 a.m. on Monday and Wednesday). Defendants also contend that IPC inmates could participate in educational activities, just not with those inmates in general population, shower during recreation, have access to the law library, and participate in visits with their attorneys. Franko Aff. ¶¶ 13, 18; <u>see also</u> Dkt. No. 18 at 54 (facility rule book outlining attorney visitation); <u>compare</u> Compl. at 4 (alleging that Osgood could not contact his attorney or attend vocational programs or religious services) <u>with</u> Franko Aff. ¶ 17 ("Osgood did not . . . ever request access to the law library, or to religious services.").

Osgood maintains that he submitted a grievance regarding his continued placement in IPC; however, his inmate records do not include such documentation. Compl. at 5; Franko Aff. ¶ 15 (Osgood's "records do not reflect that he attempted to file a grievance or that he ever asked for a review of his classification by [Osgood]." However, "[i]n March of 2012 it was suggested to [Franko] in person, and by mail by a representative of the . . . [COC], that the 23-hour a day lock up was not appropriate unless there was an identified safety and security risk." Franko Aff. ¶ 20. As a result, Osgood's classification status was reexamined and he was taken out of IPC. Franko Aff. ¶ 20; Dkt. No. 18 at 90-93 (subsequent inmate

classification form completed March 19, 2012 indicating that an override was utilized to end Osgood's IPC status); Dkt. No. 18 at 94 (Administrative Segregation Form initially signed on February 4, 2012 which indicates that as of March 19, 2012 Osgood's "classification was reviewed at the behest of . . . the NYS COC."). Franko maintains that defendants "believed that there were such [safety and security] risks identified by the classification process . . . [but that nonetheless] Officer Payne overrode the form . . . ." Franko Aff. ¶ 20.

Defendants assert that during the meeting with the COC, Franko "was informed that [Montgomery's] classification scheme was not incorrect [and] . . . th[e] evaluation forms being used did not discriminate . . . It was merely suggested that . . . Montogomery . . . review its procedures to insure that those in protective custody needed to be there." Franko Aff. ¶ 21. Osgood spent approximately two months in IPC custody; however, the status of how long he was classified in IPC due to his criminal history versus his mental health needs after February 18, 2012 is unclear. Specifically, there is nothing in the record which indicates what the duration of that close confinement hold was and if it was terminated between February 18, 2012 and March 19, 2012. Construing the complaint in the light most favorable to Osgood, the undersigned will assume that the remainder of the last month Osgood was in IPC it was due to his criminal history and not mental health needs.

### III. Discussion

In his complaint, Osgood alleges that his Eighth Amendment rights were violated by defendants' discriminatory practice of housing inmates with a present or prior sex offenses in IPC. While stated as an Eighth Amendment claim, such contentions are best analyzed pursuant to an Equal Protection analysis. Furthermore, liberally construing Osgood's

7

complaint, he has alleged a violation of his Fourteenth Amendment regarding (1) his conditions of confinement and (2) due process procedures for both his initial and continued IPC confinement.  Lastly, liberally construing Osgood's allegations, he also proffered claims regarding his access to counsel and religious services.  Defendants seek dismissal contending that (1) Osgood's conditions of confinement, access to counsel, access to religious services, and Equal Protection claims are meritless; (2) they are entitled to qualified immunity; and (3) the Prisoner Litigation Reform Act ("PLRA") precludes any recovery given the lack of physical injuries[4].

## A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

---

[4] Defendants correctly state that the PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).  Had Osgood sought recovery for compensatory damages related to emotional injury, such recovery would be precluded without showing a concomitant physical injury.  Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999) ("[I]n the case of suits seeking damages for mental or emotional injuries . . . a defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements [and make a prior showing of a physical injury].").  However, Osgood seeks punitive damages and makes no mention of linking the damages to emotional harm.  Thus, defendants' argument is moot.  Accordingly, for these reasons, defendants' motion is denied on this ground.

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue

for trial.  The non-moving party must do more than merely show that there is some doubt or

speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could

find in favor of the non-moving party for a court to grant a motion for summary judgment.

Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v.

Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the

non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," . . . that a pro se litigant's
> submissions must be construed "liberally,". . . and that such
> submissions must be read to raise the strongest arguments that
> they "suggest," . . . .  At the same time, our cases have also
> indicated that we cannot read into pro se submissions claims
> that are not "consistent" with the pro se litigant's allegations, . . .
> or arguments that the submissions themselves do not "suggest,"
> . . . that we should not "excuse frivolous or vexatious filings by
> pro se litigants," . . . and that pro se status "does not exempt a
> party from compliance with relevant rules of procedural and
> substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537

F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded

district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his

pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion;

the requirement is that there be no genuine issue of material fact.  <u>Anderson</u>, 477 U.S. at

247–48.


## B. Access to Counsel

"[T]he right to counsel and the right to access to the court are interrelated . . . [h]owever,

the two rights are not the same."  <u>Benjamin v. Fraser</u>, 264 F.3d 175, 186 (2d Cir. 2001).

"[A]ccess claims . . . concern[] the ability of . . . prisoners to attack their sentences, directly

or collaterally, and to challenge the conditions of their confinement.  By contrast . . . the

Sixth Amendment [confers the] right of a pretrial detainee, in a case brought against him by

the state, to utilize counsel in his defense."  <u>Id.</u> (internal quotation marks, alterations, and

citations omitted).


### 1. Sixth Amendment

"[P]retrial detainees need access to the courts and counsel . . . to defend against the

charges brought against them."  <u>Benjamin v. Fraser</u>, 264 F.3d 175, 186 (2d Cir. 2001)

(citations omitted).  Accordingly, the Second Circuit has determined that a pretrial

detainee's Sixth Amendment rights are infringed upon when prison regulations "unjustifiably

obstruct", "infringe", "unreasonably burden", or "significantly interfered" with the detainee's

access to counsel.  <u>Id.</u> at 187 (quoting <u>Procunier v. Martinez</u>, 416 U.S. 396, 419 (1989); <u>Bell</u>

<u>v. Wolfish</u>, 441 U.S. 520, 547 (1979); <u>Wolfish v. Levi</u>, 573 F.2d 118, 133 (2d Cir. 1978);

Cobb v. Aytch, 643 F.3d 946, 957 (3rd Cir. 1981) respectively).

In this case, Osgood states that the twenty-three hours a day he spent in lock down "does not allow [him] the right to contact [his] lawyer when needed . . . ." Compl. at 4. However, in defendants' papers the facility rule book indicates that accommodations can be made, upon request, for attorneys visits for those individuals in IPC. The undersigned liberally construed Osgood's complaint as Osgood's conclusory allegations fail to indicate what counsel he was denied access to and for what purpose the counsel was involved, when his requests were made and how they were handled, or how the defendants' proffered policy obstructed, interfered, unreasonably burdened or infringed upon his Sixth Amendment rights. It is assumed that Osgood refers to his representation regarding his pending criminal matter for failure to register based upon a charge of assault and that he is contending that his ability to communicate with that counsel in pursuing his criminal defense was impeded. However, for the reasons stated above, upon the present record such conclusory claims are insufficient to establish a Sixth Amendment violation and defendants' motion should be granted on this ground.

## 2. First Amendment and Due Process

Pretrial detainees also have a constitutional right for meaningful access to the courts, which may be satisfied pursuant to the appointment of counsel. Bourden v. Loughren, 386 F.3d 88, 93 (2d Cir. 2004) (citing cases). Such a right "requires that prisoners defending against criminal charges or convictions (either directly or collaterally) or challenging the conditions of their confinement . . . not be impeded from presenting those defenses and claims for formal adjudication by a court." Id. at 96 (citing inter alia Bounds v. Smith, 430

U.S. 817, 823 (1977)).  Thus,

> when a prisoner with appointed counsel claims that he was
> hindered by prison officials in his efforts to defend himself or
> pursue other relevant legal claims, he must show that, on the facts
> of his case, the provision of counsel did not furnish him with the
> capability of bringing his challenges before the courts, not that he
> was denied effective representation in the court.

Id. at 98 (citations omitted).

Construing Osgood's claims liberally, there is also the potential that he is contending

that defendants denied him meaningful access to the courts.  Osgood attempts to allege

that defendants restricted Osgood's access to the point where it was an impediment.

However, for substantially the same reasons as stated above, Osgood's complaint fails to

indicate what he was hindered from completing.  Osgood does not make any contentions

about his ability to present his defense or how his criminal action proceeded, or failed to

proceed, while incarcerated at Montgomery.  Nor does Osgood contend that his counsel

was incapable of presenting his various defense arguments.  Thus, even viewing the facts

in the light most favorable to Osgood, he has failed to proffer facts sufficient to support any

potential access to the court claim.  Accordingly, defendants' motion on this ground is

granted.


### C. Religious Services

The First Amendment protects the right to free exercise of religion.  See generally Cutter

v. Wilkinson, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain

some measure of the constitutional protection afforded by the First Amendment's Free

Exercise Clause."  Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v.

12

Procunier, 417 U.S. 817, 822 (1974)); see also Nolley v. County of Erie, No. 07-CV-488S, 2008 WL 859165 (W.D.N.Y. Mar. 31, 2008) (applying First Amendment freedom of religion protections to a pretrial detainee)[5].

> To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective.

Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives – including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted); see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

> The Turner Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

""[P]risoners have a constitutional right to participate in congregate religious services." Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted). "Confinement in keeplock does not deprive prisoners of this right." Id. (citations omitted). While the

---

[5] Unpublished cases will be attached to the Report-Recommendation and Order.

Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, . . . prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." Young v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989) (citations omitted). "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) (citations omitted). The same analysis is undertaken when there is an allegation that "an individual dec[ided] to deny a prisoner the ability to engage in some requested religious practice." Ford, 352 F.3d at 595 n.15 (citations omitted).

In this case, even liberally construing Osgood's claim, he has failed to state a First Amendment claim. Osgood's complaint fails to establish the first element in the analysis as Osgood's complaint and motion papers remain silent with respect to what religion Osgood was a member of and, by extension, what sincerely held religious practices were withheld from him during his IPC confinement. Osgood's general and conclusory claims that all IPC inmates were precluded from practicing religion are insufficient to raise a question of material fact. Without establishing a firmly held religious belief or identifying any interference with those practices, the discussion cannot further progress to an evaluation of whether isolating IPC residents from general population religious services was reasonable. See e.g., Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006) (articulating test that inmates "must show at the threshold that the disputed conduct . . . burdens his sincerely held religious beliefs," prior to advancing to the Turner test and "legitimate penological interests that justify the impinging conduct . . . .") (citations omitted). Accordingly,

14

defendants' motion on this ground should be granted.

### D. Conditions of Confinement

Osgood also contends that he was subjected to unconstitutional conditions of confinement since he was locked in his cell for twenty-three hours a day and was only allowed out of his cell for one hour a day to shower, engage in recreation, speak with fellow inmates and watch television. Osgood also contends that the unconstitutional conditions infringed upon his ability to visit with his family as there were only two times early in the day where such visitation was permitted.

Claims concerning the conditions of confinement brought by a pretrial detainee, such as Osgood, must be analyzed under the Fourteenth Amendment's Due Process Clause. The Due Process Clause provides that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Bell v. Wolfish, 441 U.S. 520, 535-36 (1979) (citations omitted). However, the standards when evaluating deliberate indifference to a person in custody are identical whether under the Eighth or Fourteenth Amendment. Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir.2009) ("Claims should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); see also Shane v. Winnebego County Dep't of Soc. Servs., 489 U.S. 189, 199–200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . [including] food, clothing, shelter, medical care, and reasonable safety . . . .") (citations omitted). Accordingly, cases analyzed under the Eighth Amendment provide guidance in analyzing cases, as here, considered

under the Fourteenth Amendment.  Therefore, Osgood's conditions of confinement claim

will be considered under Eighth Amendment standards.

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual

punishment."  U.S. Const. amend. VIII.  "The Constitution does not mandate comfortable

prisons but neither does it permit inhumane ones, and it is now settled that the treatment a

prisoner receives in prison and the conditions under which he is confined are subject to

scrutiny under the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 832 (1884). As

with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and

subjective test."  Jolly v. Coughlin, 76 F.3d 468,  480 (2d Cir. 1996) (citations omitted).

Thus, "a prisoner may prevail only where he proves both an objective element – that the

prison officials' transgression was sufficiently serious– and a subjective element – that the

officials acted, or omitted to act, with a sufficiently culpable state of mind . . . ."  Phelps v.

Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an
> Eighth Amendment violation] when each would not do so alone . . .
> [such as] when the conditions have a mutually enforcing effect that
> produces the deprivation of a single, identifiable human need such
> as food, warmth, or exercise – for example, a low cell temperature
> at night combined with a failure to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and

unusual punishment when no specific deprivation of a single human need exists."  Id. (citing

Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison

official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate

16

health or safety" Farmer, 511 U.S. at 834 (citations omitted).

In this case, Osgood's claims that he was confined in administrative segregation for twenty-three hours a day, only allowed to shower, visit his family, use the phone, and interact with other inmates during his one hour long recreation, prohibited from wandering around outside of his cell, limited in his ability to watch television, and being forced to pick and choose which amenities he wanted to avail himself to given his limited amount of time outside of his cell, are insufficient to support an Eighth Amendment claim. Generally, administrative segregation conditions, even though "restrictive and . . . harsh, [are insufficient to establish Eighth Amendment violations because] they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Osgood has failed to allege any deprivations of a single, identifiable human need. See Greene v. Furman, 610 F. Supp. 2d 234, 237 (W.D.N.Y. 2009) (holding that inmate's Eighth Amendment claim originating from his confinement in segregation was insufficient to state a constitutional claim as the allegations of denied exercise, showers and haircuts, did not represent atypical treatment, result in physical injury, or establish cruel and unusual punishment). Moreover, to the extent Osgood contends that his inability to program was an Eighth Amendment violation, such contentions are meritless. See Griffin v. Coughlin, 743 F. Supp. 1006, 1017 (N.D.N.Y. 1990) ("[Inmates] have no eighth amendment right to prison work and educational activities.") (citations omitted). Osgood was given warmth, shelter, clothing, food, and exercise. Osgood was allowed to shower and have two morning visitations throughout the week. Osgood was just upset that he did not have more freedom with his time and movement. However, such claims are insufficient to establish the objective prong of the analysis.

17

Accordingly, to the extent such Eighth Amendment claims are apparent, defendants' motion should be granted and the claims dismissed.

## E. Fourteenth Amendment

### 1. Due Process[6]

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV § 1.  It is important to emphasize that due process "does not protect against all deprivations of liberty.  It protects only against deprivations of liberty accomplished without due process of the law." Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted).  "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).

As a pretrial detainee, Osgood's "liberty interest in freedom from restraint is highly qualified and must be balanced against the state's reasons for restraining that liberty[; thus,] restrictions on pretrial detainees . . . may not amount to punishment . . . ." Benjamin v. Fraser, 264 F.3d 175, 188 (2d Cir. 2001) (citations and internal quotation marks omitted). Unlike convicted prisoners, who must satisfy the standard of "atypical and significant hardship" outlined in Sandin v. Conner, 515 U.S. 472 (1995), a pretrial detainee need not meet such a stringent standard because "[a] detainee's interest in freedom from unjustified infliction of pain and injury is more substantial . . . ." Id. at 188-90; see also Iqbal v. Hasty,

---

[6] Defendants' memorandum of law did not address any due process issues.

18

490 F.3d 143, 146 (2d Cir. 2007) rev on other grounds Ashcroft v. Iqbal, 556 U.S. 662 (2009) ("Th[e Second Circuit] has said that Sandin does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process.").

### a. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). "Aside from any state policy or regulation, the force of the Due Process Clause itself protects pre-trial detainees from restrictive confinement." Shine v. Hofmnn, No. 06-CV-237, 2009 WL 2179969, at *5 (D. Vt. July 22, 2009) (citing Kentucky Dep't of Corr., 490 U.S. at 459-60).

As previously discussed, the Second Circuit has determined that pretrial detainees may not be subjecting to punishment prior to an adjudication of guilt. Benjamin, 264 F.3d at 188 (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)). In determining whether a restriction is punitive, a court may consider

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of scienter, whether its operation

> will promote the traditional aims of punishment – retribution and
> deterrence, whether the behavior to which it applies is already a
> crime, whether an alternative purpose to which it may rationally be
> connected is assignable . . . and whether it appears excessive in
> relation to the alternative purpose assigned . . . .

Bell, 441 U.S. at 537-38 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69

(1963)).

> Absent a showing of an expressed intent to punish, the
> determination whether a condition is imposed for a legitimate
> purpose or for the purpose of punishment generally will turn on
> whether an alternative purpose to which the restriction may
> rationally be connected is assignable for it, and whether it appears
> excessive in relation to the alternative purpose assigned to it.
> Thus, if a particular condition or restriction of pretrial detention is
> reasonably related to legitimate governmental objective, it does not,
> without more, amount to punishment.  Conversely, if a restriction or
> condition is not reasonably related to a legitimate goal – if it is
> arbitrary or purposeless – a court permissibly may infer that the
> purpose of the governmental action is punishment that may not
> constitutionally be inflicted upon detainees . . . .

Id. at 538-39 (internal quotation marks and alterations and citations omitted); see also

Benjamin, 264 F.3d at 188 (same).


### i. Initial Placement in IPC

New York regulations require "chief administrative officer[s] of each [local or county]

correction facility [to] establish, implement, and maintain a formal and objective system for

the consistent classification of all inmates."  N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013.1.

These detailed regulations provide (1) various classification categories (Id. § 7013.4); (2)

provisions for a screening instrument which records information regarding the inmate's

physical and mental health, criminal history, incarceration history, and any other relevant

information (Id. § 7013.7); (3) requirements that classification be generally determined within five business days of admission into the facility (Id. § 7013.8); and (4) conditions under which an inmate's classification should be changed (Id. § 7013.9).

The Montgomery policies regarding classification reference the above regulations. Dkt. No. 18 at 48. Specifically, the Montgomery policy states that initial screening and risk assessment will occur and classification will generally occur within five business days. Id. at 48 (citing N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013). Additionally, the policy provides that

> INMATES WHO . . . HAVE BEEN ASSIGNED TO PROTECTIVE CUSTODY SEGREGATION AFTER THE COMPLETION OR DURING THEIR CLASSIFICATION SCREENING WILL BE SUBJECT TO A 23 HOUR A DAY LOCK IN STATUS AND WILL BE HOUSED SEPARATELY FROM GENERAL POPULATION, FOR A MANDATORY 60 DAY PERIOD OF TIME. AFTER 60 DAYS YOU MAY REQUEST, IN WRITING, TO THE JAIL ADMINISTRATIVE OFFICER A CHANGE IN YOUR PROTECTIVE CUSTODY STATUS. IF IT IS DETERMINED THAT THERE IS NO FURTHER THREAT TO YOUR SAFETY, YOU WILL BE TAKEN OUT OF PROTECTIVE CUSTODY AND MOVED INTO GENERAL POPULATION. HOWEVER, IF IT IS DETERMINED THAT A THREAT TO YOUR SAFETY STILL EXISTS, YOU WILL BE KEPT IN PROTECTIVE CUSTODY AND YOUR SITUATION WILL BE RE-EVALUATED EVERY 30 DAYS AFTER UNTIL SUCH TIME THAT NO THREAT EXISTS.

Id. (citing N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013) (emphasis in original). While not specifically articulated in the policy, defendant Franko affirmed, and the jail intake forms corroborated, that the same categories were used when classifying inmates as those articulated in the New York regulations. Most specific to this case was Osgood's present and past criminal charges.

It is undisputed that initially, during classification, Osgood spent four days segregated for

classification purposes.  Moreover, "[t]he [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir. 1995) (internal quotation marks and citations omitted).  The balancing test articulated in Turner v. Safely has been deemed uniquely instructive in considering whether "a prison regulation infringing on an inmate's constitutional rights is valid[,] so long as the regulation is reasonably related to the legitimate penological interests."  Harvey v. Harder, No. 09-CV-154 (TJM/ATB), 2012 WL 4093791, at *7 (citing Turner, 482 U.S. at 89).

> The Turner Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

A recent case in the Northern District of New York has already deemed the initial, temporary segregation of an inmate in a county jail during classification procedures valid and not an infringement upon due process protections.  Harvey, 2012 WL 4093791, at *7. In that case, the county jail had identical initial classification policies also based on the New York regulations.

> Until an inmate is screened for prior violence; propensity for victimization; possible enemies; behavior; and adjustment, the facility administrators have no way of knowing where the best place to house the inmate will be.  Thus, a short classification period in administrative segregation in order to complete this objective is a completely reasonable restriction on an inmate's liberty.

<u>Harvey</u>, 2012 WL 4093791, at *7.  For substantially similar reasons, even given Osgood's pretrial detainee status, to the extent that Osgood challenges the initial five day classification period spent in segregation such contentions are insufficient to establish a due process violation.  Defendants actions in confining Osgood in segregation for the limited purposes of classifying him was related to a legitimate penological purpose to which there are no ready alternatives and for which the segregation was neither punitive nor excessive.  Accordingly, for these reasons to the extent Osgood has attempted to plead a due process claim, such contentions are insufficient to support a constitutional violation.

### ii.  Continued Placement in IPC

As a pretrial detainee, the Due Process Clause provides a liberty interest in remaining free from restrictive confinement.  Moreover, as articulated above, confinement which is deemed punitive pursuant to the above stated factors indicates a liberty interest requiring procedural due process protections.  Defendants continually contend that Osgood's confinement was administrative and prophylactic, not disciplinary.  <u>See</u> <u>e.g.</u> <u>Colon v. Goord</u>, No. 05-CV-129 (TJM/GJD), 2008 WL 783364, at *7 (N.D.N.Y. Mar. 20, 2008) (explaining that in the NYS Department of Corrections and Community Supervision ("DOCCS") facilities, which fall under different regulations but have analogous housing classifications, "IPC is **not** a disciplinary unit . . . .") (emphasis in original).

However, the undisputed housing conditions for Osgood in IPC, particularly being locked in one's cell for twenty-three hours a day, were more analogous to disciplinary confinement than segregation.  <u>See</u> <u>e.g.</u> <u>Id.</u> (explaining that in the DOCCS facilities "IPC inmates are afforded more privileges and have less restrictions than Ad[ministrative] Seg[regation]

23

inmates . . . [who] are subject to the same restrictions as disciplinary S[pecial ]H[ousing ]U[nit] inmates . . . .").  Accordingly, Osgood's restraint to IPC was comparable to confinement which has historically, and is still presently, regarded as punishment.  This was further acknowledged by the COC whereupon it urged defendant Franko to reconsider the classifications of IPC inmates to ensure that the appropriate inmates were being confined there.  See also Id. ("A review of [DOCCS] rules shows that many of the privileges accorded to general population inmates are also accorded to IPC inmates, albeit in a separate part of the facility."); Franko Aff. ¶¶ 20-21; see Dkt. No. 18 at 94 (Administrative Segregation Form initially signed on February 4, 2012 which indicates that as of March 19, 2012 Osgood's "classification was reviewed at the behest of . . . the NYS COC."); cf. Torres v. Stewart, 263 F. Supp. 2d 463, 470 (D.Conn. 2003) (discussing the correctness of summary judgment against a pretrial detainee due process case alleging incorrect assignment to maximum security where the plaintiff failed to present evidence that a "decision constituted impermissible punishment.").  Further, while defendants stand by their initial classification scheme stating that they believed there were safety and security reasons supporting the IPC confinement, none of these were included in the present record or specifically argued to have existed by defendants.  Accordingly, the fact that Osgood spent approximately two months as a pretrial detainee in an environment generally reserved for those guilty of disciplinary infractions and subject to punitive confinement, is sufficient to satisfy a liberty interest raising due process concerns.

Pursuant to Bell, in the face of behavior that may be deemed punitive, such restrictions will not be held as such if there is a legitimate governmental purpose proffered.  Defendants have failed to proffer a penological justification for classifying federal pretrial detainees with

prior or pending sex crimes in IPC.  See Shine v. Hofmnn, No. 06-CV-237, 2009 WL

2179969, at *5 (D. Vt. July 22, 2009) (holding that where (1) a pretrial detainee was placed

in "close custody" with only two hours of recreation a day because he (i) had a disciplinary

rules violation with the last year and (ii) was a detainee and (2) defendants failed to offer a

legitimate penological justification for the custody determination, such confinement was

deemed punitive).  Defendants repeatedly state that housing inmates with a criminal history

of sex crimes or with a sex offender status was not punitive, but rather prophylactic, as

these inmates represented a risk to safety and security of the facility.  Defendants have

proffered an affidavit from Franko which indicates that inmates with sex offender status

were generally more vulnerable and susceptible to victimization, the population of the jail

was increasing without a concomitant increase in the number of corrections officers, and

that increase was attributed primarily to larger numbers of sex offenders entering custody.

Other districts have deemed an inmate's sex offender status to represent a safety issue

requiring protective custody. See e.g.  Tucker v. Royce, Nos. 09CV35-MPM-JAD,

09CV106-MPM-JAD, 10CV4-MPM-JAD, 2011 WL 541116, at *6 (N.D.Miss. Feb. 8, 2011)

(denying Eighth Amendment claims regarding IPC classification because the inmate "was

placed in [IPC] for a reason: as a sex offender, he was vulnerable to assault from other

inmates . . . .").  Moreover, the Second Circuit has recognized, though not explicitly

commented on the constitutionality of, the policy of offering IPC to inmates with sex

offender histories.  See Arnold v. County of Nassau, 252 F.3d 599, 601 (2d Cir. 2001)

(explaining in an action alleging failure to protect, and not a due process violation, that the

inmate was initially placed into IPC "pursuant to 'Warden's Order: Sex Crimes,' an order

designed to assure that inmates charged with sex crimes are removed from the general

25

prison population because they are a greater risk of assault by other inmates.").

However, the present record proffers nothing more than conclusory assertions about the circumstances faced by defendants at Montgomery. Defendants have failed to provide any documentation regarding information including specific numbers of the inmate population and the percentage of sex offenders previously housed at Montgomery, that population's anticipated increase in comparison to the rest of the incoming inmate population, or the number of attacks on sex offenders or those with a sexually based criminal history. See Smart, 441 F. Supp. 2d at 645 (denying qualified immunity because defendants failed to demonstrate anything more than "conclusory statements" about safety concerns essentially providing the court with "no showing that there was any reason to fear for [the inmate's] personal safety."). Moreover, it stands to reason that with multiple housing pods and an increased number of inmates with sex offenses, an alternative existed for housing all sex offenders together in a housing unit, as opposed to IPC and lock-down in individual cells, providing them with freedoms identical to those in general population while still segregating and protecting them from the allegedly dangerous general population inmates.

As a liberty interest has been established, the next question is whether Osgood was provided with appropriate procedural protections. As a form of administrative segregation, as opposed to disciplinary confinement, placement in IPC "requires only an informal, nonadversary review." Smart v. Goord, 441 F. Supp. 2d 631, 641 (S.D.N.Y. 2006). The procedural due process protections are minimal, dictating that the informal review must occur within a reasonable time, after the inmate has had some notice of the charges lodged against him and an opportunity to present his views to the administrator making the determination about segregation. See e.g. McClary v. Kelly, 4 F. Supp. 2d 195, 212

26

(W.D.N.Y. 1998) (citing <u>Hewitt . Helms</u>, 459 U.S. 460, 460, 476 (1983)).  Moreover, the "prison officials must engage in periodic review of the decision . . . to ascertain whether a prisoner remains a security risk . . . [which is] supported by some evidence."  <u>Id.</u> at 212-13 (internal quotation marks and citations omitted).  Lastly, "administrative segregation may not be used as a pretext for indefinite confinement[, so] . . . periodic reviews [cannot be] a sham; the reviews must be meaningful and not simply perfunctory."  <u>Id.</u> at 213 (citations omitted); <u>see</u> <u>also</u> <u>Covino v. Vermont Dep't of Corr.</u>, 933 F.2d 128, 130 (2d Cir. 1991) (explaining that "[a]t some point, however, the administrative necessity for involuntary lock-up begins to pale . . . [and] smacks of punishment.").

However, when considering the restraint of a pretrial detainee, if "a purportedly administrative restraint . . . is found to be tantamount to punishment," the due process standard governed by "<u>Wolff v. McDonnell</u>, which requires written notice of the charges at least twenty-four hour before any hearing, a written statement of factual allegations against the inmate, and at least a limited ability to present witnesses and evidence," applies.  <u>Taylor v. Santana</u>, No. 05-CV-1860(AKH), 2007 WL 737485, at *4 (S.D.N.Y. Mar. 6, 2007) (citing <u>Benjamin</u>, 264 F.3d at 190).  While defendants contend that Osgood's IPC placement was prophylactic and not punitive, for the reasons outlined above, such contentions have been deemed insincere and Osgood's restraint has been found excessive given the circumstances.  <u>Cf.</u> <u>Taylor</u>, 2007 WL 737485, at *5 (citations omitted) (deeming defendants' actions in sending a pretrial detainee, found guilty of assault for his involvement in an altercation which resulted in the death of another inmate, to solitary confinement during which plaintiff alleged he did not receive notification of the reasons for confinement for approximately one month, as a non-punitive restriction subject to the informal, due process

27

standards given defendants legitimate penological purpose in placing a detainee with "uncontrolled rage and fighting prowess that could be imminently dangers to himself and to others . . . ." in confinement for the protection of the plaintiff and the rest of the prison population).

Initially, Osgood received a document that indicated that because of his criminal history, he was to be placed in IPC. Osgood signed the form which served as notification of the administrative segregation as well as the initial opportunity for Osgood to express his displeasure with his classification. This appears to comply with the minimal procedures guaranteed by the Due Process clause for administrative, non-punitive confinement. However, further procedures providing Osgood with a formal opportunity to present witnesses and evidence at a hearing prior to his IPC confinement were not provided.

Pursuant to Montgomery's policies which are based on state regulations, in the case of administrative segregation pending a disciplinary hearing, the inmate may be placed in administrative segregation for the duration of the disciplinary process, but a formal disciplinary hearing shall occur within fifteen business days from the date of the incident. Dkt. No. 18 at 48 (citing N.Y. COMP. CODES R. & REGS. TIT. 9, §§ 7006.7-7006.8). While Osgood was not technically labeled as a disciplinary inmate, for the reasons stated above, his confinement was punitive and review of the placement should have happened, it seems at the very least, within the same fifteen day window.

Accordingly, as defendants have failed to provide sufficient evidence to establish that neither their intent nor Osgood's restrictions were punitive or that such restrictions were pursuant to a legitimate governmental purpose and, in view of Osgood's pretrial detainee status and construing the facts in the light most favorable to Osgood, his IPC confinement

was punitive and he was entitled to enhanced due process protections.  While the lesser due process protections appear to have been met, the record fails to reflect the same of the greater due process protection afforded to those under punitive confinement.  Therefore, to the extent Osgood has pled substantive due process claims surrounding the punitive character of his confinement and related procedural due process claims regarding his continued placement in IPC, such claims remain.

### b. Substantive Due Process

Liberally reading Osgood's complaint, it appears he has also alleged a per se substantive due process claim concerning his placement and continued confinement in IPC based on his criminal history and pending charges.   "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense . . . but not against government action that is 'incorrect or ill-advised'" Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir.1994) (internal citations omitted). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Okin v. Villiage of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).  As already observed by the Northern District of New York, "[v]ery few conditions of prison life are 'shocking' enough to violate a prisoner's right to substantive due process.  In Sandin v. Conner, the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs."  Samms v. Fischer, No. 10-CV-349 (GTS/GHL), 2011 WL 3876528, at *12 (N.D.N.Y. Mar. 25, 2011) (citations

omitted).

In this case, while the actions of defendants in articulating a policy which summarily housed a population of inmates in IPC pursuant to potentially legitimate concerns related to inmate facility and security could be categorized as incorrect or ill-advised, it does not appear that such a policy was arbitrary, conscience shocking, or constitutionally oppressive. Moreover, given the limited number of recognized circumstances where substantive due process is advanced, and the dissimilarity between those instances and the present claim, to the extent that Osgood is attempting to advance such due process arguments, they are insufficient to establish a constitutional claim.

## 2. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination."). "[A]bsent classification by race, alienage or national origin, legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Vargas v. Pataki, 899 F. Supp. 96, 98 (N.D.N.Y. 1995) (citations, quotation marks, and internal alterations omitted). Accordingly, strict scrutiny shall only be employed "where the classification involves a fundamental right or a suspect class." Id. (citations and quotation marks omitted).

If an inmate is unable to establish membership in a protected class, "the Supreme Court has recognized 'class of one' claims, where the plaintiff must prove that he was intentionally treated differently from others similarly situated without a rational basis for the difference in treatment." Fortunatus v. Clinton County, N.Y., No. 12-CV-458 (RFT), 2013 WL 1386641, at *11 (N.D.N.Y. Apr. 4, 2013) (citing Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). Such plaintiffs

> must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves . . . [and] must establish that (1) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) (citations omitted). "Generally, whether parties are similarly situated is a fact-intensive inquiry," best suited for the jury, unless "no reasonable juror could find that the persons to whom plaintiff compares itself are similarly situated," and then summary judgment is appropriate. Id. (citations omitted).

Prisoners are not a part of a suspect class. Scott v. Denison, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) (citations omitted); Lee v. Governor of State of New York, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class . . . ."). "[S]ex offenders [also] do not compromise a suspect or quasi-suspect class . . . [thus any] allegedly different treatment is subject to rational basis scrutiny, that is, it must be rationally related to a legitimate state interest." Taylor v. New York State Dep't of Corr. Servs., No. 07-CV-1288 (NAM/RFT), 2009 WL 3522781, at *2 (N.D.N.Y. Oct. 29, 2009) (citations omitted).

31

In this case, a question of fact remains as to Osgood's Equal Protection claim. Both sides agree that Montgomery's policy was to summarily classify and house all sex offenders in IPC for their own safety. Therefore, sex offenders were treated differently from all other inmates who were generally housed in, and accorded the amenities of, general population. Osgood has successfully established a high degree of similarity between himself and the other sex offenders and such similarity and difference in treatment are undisputable so that mistake is not a reasonable possibility.

As previously discussed, defendants have proffered an affidavit indicating that their policy of confining sex offenders and those with sexual offenses in their criminal history to IPC was based on a legitimate concern for safety in the prison given the increasing number of inmates and stagnant number of staff. Furthermore, for the reasons articulated above, there are questions of fact which surround the legitimacy of Montgomery's policy given the lack of factual and statistical evidence. Conversely, if defendants' claims are proven to be more than conclusory, a rational basis may be deemed to exist. Accordingly, defendants' motion should be denied on this ground.

## F. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).

> [A] decision dismissing a claim based on qualified immunity at the summary judgment state may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude (1) that the official violated a statute or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.

Coollick v. Hughes, 699 F.2d 211, 219 (2d Cir. 2012) (quoting Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2080 (2011)) (internal quotation marks omitted).  The Supreme Court has granted district courts "discretion to decide which of the two prongs . . . to tackle first [in order to] . . . save[] judicial resources by avoiding unnecessary decisions whether certain conduct violates a constitutional or statutory right, which it is beyond reproach that the conduct was not objectively unreasonable in light of existing law."  Id. (internal quotation marks and citations omitted).

A constitutional right is clearly established if it is both reasonably specified and affirmed by both Supreme Court and Second Circuit case law and understood to be viewed by a reasonable defendant as unlawful under the status of the law at the relevant time in question.  Looney v. Black, 702 F.3d 701, 706 (2d Cir. 2012).  Such an inquiry is context-specific, looking at "the contours of the right" which is alleged to be protected so that "the very action in question [need not] ha[ve] previously been held unlawful; but . . . in the light of pre-existing law the unlawfulness must be apparent."  Doninger v. Niehoff, 642 F.3d 334, 345-46 (2d Cir. 2011) (internal quotation marks and citations omitted).

Defendants contend that their decision to institute a policy segregating all inmates labeled as sex offenders or with sexually violent crimes in their criminal histories into IPC is protected by the qualified immunity doctrine.  While there is no New York regulation concerning the placement or review of an inmate, including a pretrial detainee, in local

33

custody being placed into IPC, or a case which has been decided presenting identical facts, the constitutional rights surrounding a pretrial detainee's right to due process and to remain housed in a manner that is not punitive were clearly established at the time of the case. See Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001). Moreover, the right of a pretrial detainee to a heightened level of due process given punitive restrictions was also clearly established. See Id. at 190. As was an inmate's right not to be treated different than others unless a rational basis existed. See Lee v. Governor of State of New York, 87 F.3d 55, 60 (2d Cir. 1996) (citing City of Cleburne v. Cleburne Living Ctr, Inc., 473 U.S. 432, 440 (1985)). Accordingly, it is apparent that Osgood's Fourteenth Amendment rights to Due Process and Equal Protection were clearly established at the time in question.

Defendants contend that because of increased inmate populations, legitimate concerns for the safety and security of the institution, inmates, and staff compelled IPC for inmates like Osgood. Similar scenarios make it clear that holding an inmate in segregation, under adverse conditions, without a legitimate basis, and without review is unreasonable. See Smart v. Goord, 441 F. Supp. 2d 631, 645 (S.D.N.Y. 2006) (denying qualified immunity where defendants "made no showing with regard to either the conditions of . . . confinement or the extent to which confinements of similar duration may or may not be typical . . . .," proffered only conclusory allegations about asserted safety concerns, and failed to defeat arguments that procedural protections afforded to inmate were anything more than "hollow formalit[ies]."). Despite defendants' proffers to the contrary, at this juncture, for the reasons stated above, the undersigned cannot conclude that defendants' have met their burden in demonstrating that the policy was rationally related to a legitimate penological objective. Without proof of a compelling safety concern, neither defendants' actions can be deemed

34

reasonable given the case law and constellation of circumstances surrounding Osgood's IPC confinement.

Accordingly, it is recommended that defendants' motion on this ground be denied.

## IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 18) be:

1. **GRANTED** with respect to Osgood's claims regarding his condition of confinement, access to counsel, and freedom to practice his religion; and

2. **DENIED** in all other respects[7].

It is also **ORDERED** that the Clerk serve a copy of this report-recommendation and order on the parties pursuant to the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  June 7, 2013
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[7] Defendants move for summary judgment contending that Osgood's Equal Protection, conditions of confinement, access to counsel, and freedom to practice his religion claims be dismissed.  For the reasons discussed supra, defendants' motion is to be granted with respect to all but the Equal Protection claims.  Defendants fail to discuss the merit of Osgood's inartfully pled due process claims which, for the reasons stated supra, should not be dismissed.